IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2017-NMSC-020

Filing Date:  May 22, 2017

Docket No. S-1-SC-34093

ARSENIO CORDOVA,

Plaintiff-Respondent,

v.

JILL CLINE, THOMAS TAFOYA,
LORETTA DELONG, JEANELLE LIVINGSTON,
CATHERINE COLLINS, ROSE MARTINEZ,
ESTHER WINTER, ELIZABETH TRUJILLO,
AND JANE DOES 1 THROUGH 10,

Defendants-Petitioners.

ORIGINAL PROCEEDING ON CERTIORARI
Abigail Aragon, District Judge

Armstrong & Armstrong, P.C.
Julia Lacy Armstrong
Taos, NM

for Petitioner Jill Cline

The Herrera Firm, P.C.
Samuel M. Herrera
Taos, NM

for Petitioner Thomas Tafoya

Steven K. Sanders
Albuquerque, NM

for Petitioners Loretta DeLong, Jeanelle Livingston, Catherine Collins, Rose Martinez, Esther Winter, and Elizabeth Trujillo

Garcia Law Firm
Marcus E. Garcia
Albuquerque, NM

L. Helen Bennett, P.C.
Linda Helen Bennett
Albuquerque, NM

for Respondent

## OPINION

**VIGIL, Justice.**

**{1}** This dispute comes before the Court in relation to a malicious abuse of process claim made by Taos school board member Arsenio Cordova (Cordova) against eighteen members of an unincorporated citizens' association (collectively, Petitioners) following their efforts to remove Cordova from office under the Local School Board Member Recall Act (Recall Act), NMSA 1978, §§ 22-7-1 to -16 (1977, as amended through 2015). We hold that petitioners who pursue the recall of a local school board member under the Recall Act are entitled to the procedural protections of the New Mexico statute prohibiting strategic litigation against public participation (Anti-SLAPP statute). *See* NMSA 1978, § 38-2-9.1 (2001). We also conclude that petitioners are entitled to immunity under the *Noerr-Pennington* doctrine when they exercise their right to petition unless the petitioners (1) lacked sufficient factual or legal support, and (2) had a subjective illegitimate motive for exercising their right to petition. *See E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961) ("To hold that . . . the people cannot freely inform the government of their wishes . . . would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights."); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (relying on *Noerr's* protection of "effort[s] to influence public officials regardless of intent or purpose" of the efforts); *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62 (1993) (holding that if the challenged litigation is objectively baseless, a court examines the subjective motivation behind the litigation to determine if the lawsuit is a sham).

**{2}** Accordingly, we reverse the Court of Appeals' holdings that the Anti-SLAPP statute and the *Noerr-Pennington* doctrine do not apply. We also reverse the Court of Appeals' holding that it did not have jurisdiction over Petitioners with pending counterclaims. *Cordova v. Cline*, 2013-NMCA-083, ¶¶ 15-17, 308 P.3d 975. We affirm the district court's holding that Petitioners' conduct was in support of the political process of a school board member recall; and thus, Petitioners properly invoked the substantive protection of the *Noerr-Pennington* doctrine and the procedural and remedial provisions of the Anti-SLAPP statute. Pursuant to Section 38-2-9.1(A), we uphold the district court order granting Petitioners' motion to dismiss. Pursuant to Section 38-2-9.1(B), Petitioners are statutorily

2

entitled to an award of attorney fees.

## I.    BACKGROUND

**{3}**    Jill Cline, a parent with children enrolled in the Taos Municipal School District, organized Citizens for Quality Education (CQE) and registered it as an unincorporated citizens' association with the Taos County Clerk. Members of CQE included Cline, Taos Municipal School Board Member Thomas Tafoya, and various other current and former school administrators. CQE alleged that Cordova had committed acts of misfeasance and malfeasance while in office. CQE initiated a petition to recall Cordova from the Taos school board pursuant to the Recall Act. *See* §§ 22-7-2, -8.

**{4}**    After collecting the requisite signatures, CQE submitted its petition to the Taos County Clerk as required under the Recall Act. *See* §§ 22-7-8(F), -9. The Taos County Clerk filed an application with the district court on May 28, 2009, requesting "a hearing [for a] determination by the court of whether sufficient facts exist[ed] to allow the petitioner to continue with the recall process" as required by the Recall Act. Section 22-7-9.1(A). Under the Recall Act, such hearing must "be held not more than ten days from the date the application is filed by the county clerk." Section 22-7-9.1(B). The hearing was continued twice and was not held until September 16, 2009.

**{5}**    At the start of the hearing, CQE voluntarily dismissed its recall petition. Given CQE's voluntary dismissal of the recall petition, the district court did not determine whether there was adequate support for the recall process to proceed.

**{6}**    Two days later, on September 18, 2009, Cordova filed a complaint against eight named members of CQE as well as ten unnamed members in their individual capacities. Cordova contended that Petitioners' recall efforts were in furtherance of a personal vendetta as opposed to legitimate claims of malfeasance or misfeasance in office. He alleged that Petitioners initiated the recall without demonstrating probable cause of his misfeasance or malfeasance in office and that the voluntary dismissal of their petition precluded any finding of whether it was adequately supported. He argued that Petitioners' affidavits were incompetent and backdated. Further, Cordova's complaint stated that the incompetent affidavits, coupled with the two continuances and voluntary dismissal of the petition, constituted malicious abuse of process. Cordova sought damages for malicious abuse of process, civil conspiracy, and prima facie tort.

**{7}**    In response to Cordova's complaint, six of the named Petitioners filed a motion to dismiss for the failure to state a claim under Rule 1-012(B)(6) NMRA, and for violations under the Anti-SLAPP statute, § 38-2-9.1(A) (requiring that "a special motion to dismiss . . . be considered by the court on a priority or expedited basis"). Petitioners asserted that Cordova filed his complaint in retaliation for their petitioning activity and thus violated their right to petition under the First Amendment to the United States Constitution. Each filing separately, Cline and Tafoya also moved to dismiss Cordova's complaint, invoked

3

New Mexico's Anti-SLAPP statute as an affirmative defense, *see* § 38-2-9.1, and asserted counterclaims against Cordova for malicious abuse of process.

**{8}**     The district court granted Petitioners' motions to dismiss, finding that Petitioners' "speech and conduct occurred in connection with public meetings and a public hearing and were in support of the political process of school board member recall[,] thus invoking the substantive protection of the First Amendment and the procedural and remedial provisions of the SLAPP statutes." The district court did not address Cline and Tafoya's counterclaims.

**{9}**     Cordova moved for certification for interlocutory appeal or, alternatively, for partial final judgment as to the district court's order. Then, without waiting for the district court to rule on his motion, Cordova filed a notice of appeal of the district court's dismissal order in the Court of Appeals. As a result, the district court entered an order finding that Cordova's filing of a notice of appeal divested it of jurisdiction and thereby declined to rule on his motion to certify the dismissal order for interlocutory appeal or for partial final judgment. The district court determined that it was likewise divested of jurisdiction to address the unresolved counterclaims of Cline and Tafoya.

**{10}**     The Court of Appeals assumed jurisdiction of this appeal and concluded that Petitioners' actions in the district court fell outside the scope of public meetings that benefit from Anti-SLAPP statutory protection. *Cordova*, 2013-NMCA-083, ¶¶ 1, 14. The Court of Appeals held that the district court's dismissal of Cordova's claims for civil conspiracy and prima facie tort should be affirmed but that his malicious abuse of process claim was sufficient to survive a motion to dismiss. *Id.* ¶ 29. Finally, the Court of Appeals determined that Cordova did not appeal from a final judgment, and thus the Court of Appeals excluded Cline and Tafoya from its holding. *Id.* ¶ 17.

## II.     STANDARD OF REVIEW

**{11}**     Each of the issues we are called upon to address requires de novo review. We review the interpretation of statutory language de novo. *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 22, 147 N.M. 583, 227 P.3d 73. We also review the interpretation and application of the United States Constitution de novo. *See State v. Pangaea Cinema, L.L.C.*, 2013-NMSC-044, ¶ 8, 310 P.3d 604. Finally, we review a dismissal under Rule 1-012(B)(6) de novo. *Valdez v. State*, 2002-NMSC-028, ¶ 4, 132 N.M. 667, 54 P.3d 71.

## III.     DISCUSSION

### A.     Appellate Jurisdiction under the Anti-SLAPP Statute

**{12}**     As a threshold matter, we must determine whether we have appellate jurisdiction over Petitioners Cline and Tafoya while they have pending counterclaims in the district

4

court. Pursuant to Rule 1-054(B)(2) (2008, amended 2016),[1] the Court of Appeals concluded that it had jurisdiction over only those Petitioners without counterclaims, and thus excluded Cline and Tafoya from the reach of its decision. *Cordova*, 2013-NMCA-083, ¶ 16 (holding that "the judgment is final for Defendants who did not have counterclaims against Cordova . . . [because] [a]n order disposing of the issues contained in the complaint but not the counterclaim is not a final judgment." (second alteration in original) (internal quotation marks and citations omitted)). Petitioners argue that the Court of Appeals had jurisdiction over all parties under the Anti-SLAPP statute because the overall purpose of the Anti-SLAPP statute would be thwarted by piecemeal litigation if some Petitioners were excluded from the appeal. *See* § 38-2-9.1(C) (providing an " 'expedited appeal' from a trial court order on the special motions"). We agree with Petitioners and hold that Section 38-2-9.1(C) allows any party to bring an interlocutory appeal from a trial court order on the special motion(s) brought pursuant to Anti-SLAPP statute.

**{13}** Our primary goal in interpreting statutory language is to "give effect to the intent of the Legislature." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted). "We look first to the plain meaning of the statute's words, and we construe the provisions of the Act together to produce a harmonious whole." *Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 14, 146 N.M. 453, 212 P.3d 341 (internal quotation marks and citation omitted). When we interpret the plain language of a statute, we read all sections of the statute together so that all parts are given effect. *Diamond v. Diamond*, 2012-NMSC-022, ¶ 25, 283 P.3d 260. "[I]f the language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, we will reject the plain meaning in favor of an interpretation driven by the statute's obvious spirit or reason." *State v. Trujillo*, 2009-NMSC-012, ¶ 21, 146 N.M. 14, 206 P.3d 125 (internal quotation marks and citations omitted).

**{14}** Section 38-2-9.1(C) of the Anti-SLAPP statute provides that "[a]ny party shall have the right to an expedited appeal from a trial court order on the special motions described in Subsection B of this section or from a trial court's failure to rule on the motion on an expedited basis." Subsection B lists several pre-trial motions. Section 38-2-9.1(B) ("If the rights afforded by this section are raised as an affirmative defense and if a court grants a motion to dismiss, a motion for judgment on the pleadings or a motion for summary judgment filed within ninety days of the filing of the moving party's answer, the court shall award reasonable attorney fees and costs incurred by the moving party in defending the action."). Importantly, the plain language of Subsection A explicitly provides that the expedited process must allow for the "*early consideration* of the issues raised by the motion

---

[1]Rule 1-054(B) has since been amended so that a judgment in a multiparty lawsuit that adjudicates all issues "as to one or more, but fewer than all, . . . parties," is not automatically deemed final. The new rule requires the court to expressly determine that there is "no just reason for delay," thus avoiding the piecemeal litigation that occurred in this case. *Id*.

and to prevent the unnecessary expense of litigation." Section 38-2-9.1(A) (emphasis added). Therefore, the plain language of Subsections A, B, and C of the Anti-SLAPP statute describe an expedited process that "is necessarily interlocutory in nature." Frederick M. Rowe & Leo M. Romero, *Resolving Land-Use Disputes by Intimidation: SLAPP Suits in New Mexico*, 32 N.M. L. Rev. 217, 231 (2002).

**{15}**     The Legislature has the authority to establish appellate jurisdiction and to create a right of appeal. *See Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 11, 111 N.M. 336, 805 P.2d 603 ("The appellate jurisdiction of both this Court and the court of appeals is within the legislative power to prescribe."); *Taggader v. Montoya*, 1949-NMSC-068, ¶ 7, 54 N.M. 18, 212 P.2d 1049 (noting that the Legislature has the authority to determine what "questions should be subject to judicial review by appeal"); *State v. Arnold*, 1947-NMSC-043, ¶ 11, 51 N.M. 311, 183 P.2d 845 ("The creating of a right of appeal is a matter of substantive law and outside the province of the court's rule making power."). The legislative power to create such a rule derives from Article VI, Section 2 of the New Mexico Constitution.

> Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court. In all other cases, criminal and civil, the supreme court shall exercise appellate jurisdiction as may be provided by law; provided that an aggrieved party shall have an absolute right to one appeal.

*Id.* Thus, "unless unconstitutional, it is not the role of this Court to question the wisdom, policy or justness of legislation enacted by our legislature." *State v. Maestas*, 2007-NMSC-001, ¶ 25, 140 N.M. 836, 149 P.3d 933.

**{16}**     Our interpretation also furthers the purpose of the Anti-SLAPP statute. *See* § 38-2-9.2 (noting that the purpose of the statute is to protect citizens who exercise their right to petition from the financial burden of having to defend against retaliatory lawsuits and such claims "should be subject to *prompt dismissal or judgment* to prevent the abuse of the legal process" (emphasis added)). Both the plain language and the purpose of the Anti-SLAPP statute underscore a clear legislative intent to provide an interlocutory appeal. *See Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710, 712 (7th Cir. 1986) (noting "in free-speech cases[,] interlocutory appeals sometimes are more freely allowed"). To conclude otherwise would result in protracted piecemeal litigation, a result which would be antithetical to the plain language and purpose of the Anti-SLAPP statute.

**{17}**     For these reasons, we reverse the Court of Appeals' holding declining jurisdiction over Cline and Tafoya and conclude that the Anti-SLAPP statute provides a right to an interlocutory appeal under the expedited appeal provision. As a result, our holdings in this opinion apply to all Petitioners in this case, including Cline and Tafoya.

**B.     New Mexico's Anti-SLAPP Statute Applies to Petitioners' Recall Efforts**

**{18}**     The central issue presented in this appeal is whether Petitioners' recall efforts fall within the protections of the Anti-SLAPP statute. Petitioners argue that Cordova sued them in retaliation for their attempt to recall him from office. Petitioners allege that Cordova's lawsuit is a strategic lawsuit against public participation, commonly referred to as a "SLAPP suit." *See* Rowe & Romero, *supra*, at 218. SLAPP suits "are filed solely for delay[,] distraction . . . and to [impose] litigation costs" on activists exercising their constitutional right to petition as guaranteed by the First Amendment. Rowe & Romero, *supra*, at 218 (citing *Dixon v. Superior Ct.*, 36 Cal. Rptr. 2d 687, 693 (Ct. App. 1994)). Such lawsuits are brought under the guise of a wide array of tort, contract, or civil rights conspiracy causes of actions targeting the petitioners. Rowe & Romero, *supra*, at 219. Rather than treating SLAPP suits as an ordinary commercial or tort litigation, courts must identify the challenged activities of the target of the SLAPP suit in relation to their First Amendment protections. *Id.*

**{19}**     To curtail SLAPP suits, New Mexico enacted an Anti-SLAPP statute. Section 38-2-9.1. The Legislature enacted the Anti-SLAPP statute with the policy goal of protecting its citizens from lawsuits in retaliation for exercising their right to petition and to participate in quasi-judicial proceedings. Section 38-2-9.2. In order to accomplish this goal, the Legislature created expedited procedures for dismissing actions "seeking money damages against a person for conduct or speech undertaken or made in connection with a public hearing or public meeting in a quasi-judicial proceeding before a tribunal or decision-making body of any political subdivision of the state," Section 38-2-9.1(A), and allowing for the recovery of costs and attorney fees incurred in pursuing the dismissal, Section 38-2-9.1(B). The Legislature defined "public meeting in a quasi-judicial proceeding" to include "any meeting established and held by a state or local governmental entity, including without limitations, meetings or presentations before state, city, town or village councils, planning commissions, review boards or commissions." Section 38-2-9.1(D). The Legislature specifically included protection of "the rights of its citizens to participate in quasi-judicial proceedings before local and state governmental tribunals" in the Anti-SLAPP statute. Section 38-2-9.2. By protecting quasi-judicial proceedings, the Legislature did not intend for public hearings to be unprotected. We conclude that the Legislature intended to protect all public participation, whether it be in quasi-judicial proceedings or public hearings. The specific protection in the Anti-SLAPP statute for participation in public hearings before tribunals also comports with a national political ethos, that "encourage[s], promote[s], and purport[s] to protect citizens' testifying, debating, complaining, campaigning, lobbying, litigating, appealing, demonstrating, and otherwise 'invoking the law' on public issues." George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation"* (*"SLAPPS"*): *An Introduction for Bench, Bar and Bystanders*, 12 Bridgeport L. Rev. 937, 945-46 (1992); *see also* Rowe & Romero, *supra*, at 221-23 (summarizing a lawsuit filed in state district court against protestors who appealed city approval of Wal-Mart's development plan to the district court and then the Court of Appeals and describing the lawsuit as a SLAPP because it was intended to discourage the protestors' public participation in opposing the development).

**{20}** Petitioners argue that, because Cordova's lawsuit bears the traditional hallmarks of a SLAPP suit, the Court of Appeals erred by reversing the district court's application of the Anti-SLAPP statute's procedural remedies. *See* Pring & Canan, *supra*, at 948, 950 (listing common characteristics of SLAPP suits including the involvement of local issues, politically active defendants, money damage claims which are disproportionate to realistic losses, and the inclusion of " 'Doe' defendants []to spread the chill[]"). At issue is whether Petitioners' actions preceding their voluntary dismissal of the recall petition at the sufficiency hearing were "*in connection* with a public hearing . . . before a tribunal . . . ." Section 38-2-9.1(A) (emphasis added).

**{21}** The Recall Act sets forth standards and procedures for petitioning to recall a local school board member, including the form of the petitions, § 22-7-6, canvassers' affidavits, § 22-7-7, petitioners' responsibilities for alleging acts of malfeasance or misfeasance, and for filing with the county clerk, § 22-7-8, and responsibilities of the county clerk, § 22-7-9. In the context of a recall petition, the only "public hearing" is a sufficiency hearing before a district judge and potentially an appellate court. Section 22-7-9.1. The public hearing is limited to a judge's "review of the completed face sheet together with affidavits submitted by the petitioner setting forth specific facts in support of the charges specified on the face sheet" and a "determination whether sufficient facts exist to allow petitioners to continue with the recall process." Section 22-7-9.1(C). The Recall Act's requirement of a public hearing before a tribunal is sufficient to bring Petitioners' activity under the protections of the Anti-SLAPP statute. We are also persuaded that the phrase "in connection with" in Section 38-2-9.1(A) reveals the Legislature's intent to protect all activities related to the public hearing before a tribunal—in this case the collection of petitions, filing with the county clerk, the county clerk's responsibilities, etc.

**{22}** The Court of Appeals erred when it focused solely on the sufficiency hearing before the district court. *Cordova*, 2013-NMCA-083, ¶ 14 (concluding "that a sufficiency hearing before a district court for a recall petition is not a public meeting or quasi-judicial proceeding as defined by the Anti-SLAPP statute. It is a judicial proceeding."). Such a narrow interpretation of the language of the Anti-SLAPP statute is contrary to the Legislature's broad intent to protect citizens exercising their right to petition—here the right to engage in the recall process—from SLAPP suits. *See* § 38-2-9.2.

**{23}** For these reasons, we hold that the Legislature intended the Anti-SLAPP statute to protect individuals, like Petitioners, from lawsuits intended to chill their participation in recall proceedings. The next question is whether Petitioners are entitled to the substantive protections provided by the *Noerr-Pennington* doctrine.

## C. *Noerr-Pennington* Doctrine Analysis

### 1. Evolution of the *Noerr-Pennington* doctrine

**{24}** While the Anti-SLAPP statute provides the procedural protections Petitioners

require, the *Noerr-Pennington* doctrine is the mechanism that offers Petitioners the substantive First Amendment protections they seek. The *Noerr-Pennington* doctrine is a body of federal law that provides First Amendment protections for citizens who petition the government. *See Noerr*, 365 U.S. 127; *Pennington*, 381 U.S. 657. Under the *Noerr-Pennington* doctrine, those who engage in conduct aimed at influencing the government, including litigation, are shielded from retaliation provided their conduct is not a sham. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) (relying on *Noerr*, 365 U.S. 127, and *Pennington*, 381 U.S. 657).

**{25}** The *Noerr-Pennington* doctrine emerged in the antitrust context from the Supreme Court's interpretation of the Sherman Act. *See Noerr*, 365 U.S. at 135-36; *Pennington*, 381 U.S. at 669-70. It provides protection for petitioners by excluding petitioning activity as a basis for a federal antitrust claim. *See Noerr*, 365 U.S. at 135-36; *Pennington*, 381 U.S. at 669-70. Subsequent decisions give weight to the First Amendment right to petition, thus imputing a First Amendment analysis to the doctrine. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) (extending *Noerr-Pennington* protections to "the right to petition . . . all departments of the [g]overnment" including administrative agencies and courts); *see also* Joseph B. Maher, *Survival of the Common Law Abuse of Process Tort in the Face of a Noerr-Pennington Defense*, 65 U. Chi. L. Rev. 627, 630-36 (1998); Zachary T. Jones, *"Gangster Government:" The Louisiana Supreme Court's Decision in Astoria v. Debartolo on the Application of the Noerr-Pennington Doctrine to State Law Tort Claims*, 55 Loy. L. Rev. 895, 900 (2009). Accordingly, the *Noerr-Pennington* doctrine refers to two principles establishing the basis for *Noerr-Pennington* immunity: (1) a statutory interpretation of the Sherman Act; and (2) immunity predicated on the First Amendment right to petition. *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 888 (10th Cir. 2000).

**{26}** Many "federal and state courts have concluded that the *Noerr-Pennington* doctrine is rooted in the First Amendment right to petition and therefore must be applied to all claims implicating that right, not just to antitrust claims." Aaron R. Gary, *First Amendment Petition Clause Immunity from Tort Suits: In Search of a Consistent Doctrinal Framework*, 33 Idaho L. Rev. 67, 95-96 (1996) (citing cases where "the doctrine has been applied to claims for tortious interference with contract and with business relations/economic advantage, defamation, violation of civil rights, abuse of process, and intentional infliction of emotional distress" (footnotes omitted)); *see e.g. BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) ("[W]e would not lightly impute to Congress an intent to invade . . . freedoms protected by the Bill of Rights, such as the right to petition." (internal quotation marks and citation omitted)); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930 (9th Cir. 2006) (stating that the *Noerr-Pennington* doctrine applies outside of the antitrust context); *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (holding that the *Noerr-Pennington* doctrine is not limited

9

to the antitrust context but "applies equally in all contexts").[2] Given this historical evolution, we consider the recall activities at issue to fall within the rubric of the *Noerr-Pennington* doctrine.

## 2. The sham exception to the *Noerr-Pennington* doctrine

{27} The *Noerr-Pennington* doctrine protections are not absolute. *Noerr*, 365 U.S. at 144. To be entitled to First Amendment protection under the *Noerr-Pennington* doctrine, the activity must be genuine and not a mere sham. *Id*. Sham petitions lacking a genuine, legitimate purpose of procuring favorable governmental action are not protected by the First Amendment. *See Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (1988). The United States Supreme Court has reaffirmed this sham exception in cases outside of the antitrust context. *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983). Therefore, the application of the *Noerr-Pennington* doctrine to the instant case turns on whether Petitioners' recall activities were a sham. *See Prof'l Real Estate Inv'rs, Inc.*, 508 U.S. at 60-62.

{28} To constitute a sham, the petitioning activities must meet a two-part test. First, the petitioning activities "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id*. at 60. Only upon a finding that the challenged activities are objectively baseless may the fact-finder proceed to the second element of the test—whether the subjective motivation underlying the challenged conduct was improper. *See id*. at 60-62. ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). In other words, for Cordova to overcome the *Noerr-Pennington* doctrine through the sham exception, he must first establish that Petitioners' recall petition was objectively baseless in that it did not have sufficient factual or legal support. Upon such showing, Cordova must then establish that the primary purpose for the recall was to effectuate an improper objective.

## 3. A heightened pleading standard is required under the *Noerr-Pennington* doctrine

---

[2]Notably, in *Cardtoons*, the Tenth Circuit held that "it is more appropriate to refer to immunity as *Noerr-Pennington* immunity only when applied to antitrust claims. In all other contexts . . . such immunity derives from the right to petition." 208 F.3d at 889-90. (footnote omitted). Other courts have considered *Cardtoons* an outlier case. *See Sosa*, 437 F.3d at 937. Indeed, the subsequent United States Supreme Court case, *see BE & K Constr. Co.*, 536 U.S. at 525, extended the applicability of the *Noerr-Pennington* doctrine outside the antitrust realm. *See also Tichinin v. City of Morgan Hill*, 99 Cal. Rptr. 3d 661, 676 n.9 (Ct. App. 2009) ("[T]he *Sosa* court . . . doubted that *Cardtoons* survived subsequent Supreme Court decisions extending applicability of the *Noerr-Pennington* doctrine." (citations omitted)).

**{29}** We review whether the district court properly dismissed Cordova's complaint under Rule 1-012(B)(6). Under a motion to dismiss, Cordova's allegations must be assumed true. *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917 (stating that on review, "we accept all well-pleaded factual allegations in the complaint as true and resolve all doubts in favor of sufficiency of the complaint" (internal quotation marks and citation omitted)). In the context of the *Noerr-Pennington* doctrine's protection of the First Amendment right to petition, courts require a heightened pleading standard for addressing allegations of misuse or abuse of process. *Protect Our Mountain Environment, Inc. v. Dist. Ct. In & For Cty. Of Jefferson*, 677 P.2d 1361, 1369 (Colo. 1984) (en banc). In *Protect Our Mountain Env't, Inc.*, the Colorado Supreme Court stated that the heightened standard requires that

> when . . . a plaintiff sues another for alleged misuse or abuse of the administrative or judicial processes of government, and the defendant files a motion to dismiss by reason of the constitutional right to petition, the plaintiff must make a sufficient showing to permit the court to reasonably conclude that the defendant's petitioning activities were not immunized from liability under the First Amendment.

*Id.*; *see also Forras v. Rauf*, 39 F. Supp. 3d 45, 52-54 (D.D.C. 2014) ("In order to . . prevail[] on a claim in opposition to an Anti-SLAPP motion to dismiss, a plaintiff . . . must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts." (internal quotation marks and citations omitted)). This heightened standard is "necessary to avoid 'a chilling effect on the exercise of this fundamental First Amendment right . . . [, and c]onclusory allegations are not sufficient to strip a defendant's activities of *Noerr-Pennington* protection.' " *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991) (citation omitted); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1083 (9th Cir. 1976) ("[W]here a plaintiff seeks damages . . . for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.").

**{30}** We agree with this principle. In furtherance of the policy upon which the Anti-SLAPP statute is based, we adopt a heightened standard of pleading for claims seeking damages for conduct protected by the First Amendment. *See Oregon Nat. Res. Council*, 944 F.2d at 533. This higher standard of pleading requires more than conclusory allegations in the complaint. In the instant case, Cordova must plead his claims with sufficient factual and legal specificity to establish that the recall activities were a sham to overcome both the *Noerr-Pennington* doctrine and the affirmative defense under the Anti-SLAPP statute.

**{31}** According to Cordova's complaint, the County Clerk filed the recall petition with the district court on June 1, 2009. The district court was required to review affidavits to determine whether there were sufficient facts stated to support the allegations in the recall petition. Section 22-7-9.1(C). The sufficiency hearing should have been conducted within ten days from the County Clerk's application to the court—in this case by June 10, 2009.

Section 22-7-9.1(B). Thus, the affidavits supporting the allegations of malfeasance and misfeasance should have been filed by June 10, 2009. *Id.*

**{32}** Cordova contends that the petitioning activity was objectively baseless because the affidavits were backdated. As stated in Cordova's complaint, the affidavits filed in support of the recall petition did not exist at the time the recall petition was filed. Although the date on the affidavits is June 9, 2009, they refer to events occurring much later—in July and August 2009. The affidavits were not prepared until September 8 or 9, 2009.

**{33}** Cordova also contends that the petitioning activity was objectively baseless because Petitioners voluntarily dismissed their petition at the sufficiency hearing. Cordova alleges in his complaint that the sufficiency hearing was continued twice at the request of Petitioners. Cordova claims that the delay in scheduling the sufficiency hearing "was intended to harass, annoy, embarrass, and cost . . . Cordova money." He further contends in his complaint that the delay was intended to cause adverse publicity against Cordova, as shown by a press release dated September 9, 2009. Cordova states that the claims against him made by Cline and Tafoya were therefore illegitimate, "politically motivated[,] and intended to curry favor with the School Administrators." He alleges that the filing of the affidavits "was done to publicize rumor, innuendo and gossip, with the intent of harassing, embarrassing and humiliating" him. Finally, Cordova makes a blanket assertion that he was "damaged" without specifying what damages he actually incurred. We now consider whether these allegations satisfy the objective and subjective elements of the sham exception.

**4.      Objectively baseless element of the sham exception**

**{34}** Taking Cordova's allegations as true, Petitioners' affidavits supporting the recall were not timely filed under the requirements set forth in Section 22-7-9.1. The Recall Act mandates that the recall petitioner's affidavits set forth specific facts in support of the recall and be submitted to the district court by the sufficiency hearing. Section 22-7-9.1(C). The deadline for conducting the sufficiency hearing was June 10, 2009, ten days after the petition was filed with the County Clerk. Section 22-7-9.1(B). While the affidavits were dated June 9, 2009, they were not submitted to the district court until September 8 or 9, 2009, approximately three months after the ten-day statutory deadline for conducting the sufficiency hearing. Further, the affidavits refer to events which occurred after June 9, 2009. It is logical to require affidavits in support of a recall petition to be filed before the statutory deadline for the sufficiency hearing. Section 22-7-9.1(C). Perhaps more importantly, however, the affidavits must refer to events that occurred before the filing of the recall petition.

**{35}** Here, the affidavits in support of the recall petition failed to meet the statutory requirements of the Recall Act because they were untimely, backdated, and contained attestations of events occurring after the affidavits were signed and after the recall petition was filed with the district court. Because it was impossible for the affiants to appear in person before the notary public at a single time and place and vouch for the truthfulness or

12

accuracy of the affidavits—which referred to events occurring after their affidavits were signed—no reasonable litigant could realistically expect success on the merits.[3] *See* NMSA 1978, § 14-12A-2(F) (2003) (definition of jurat). Therefore, the recall petition was objectively baseless. However, our analysis under the *Noerr-Pennington* doctrine does not end there. To pierce its shield, Cordova must also adequately allege in his complaint that the primary purpose of Petitioners' efforts to recall him from serving on the school board was improper.

## 5.      Subjective motivation element of the sham exception

**{36}**      Next, we examine Cordova's complaint to determine whether Cordova alleged sufficient facts to show that Petitioners' primary purpose in pursuing the recall was based upon an improper subjective motive. As set forth above, Cordova states that Petitioners had improper motives in bringing their recall petition because they "were politically motivated" and intended to embarrass him. Cordova asserts that such allegations are sufficient to establish that the motivations underlying the petition were "illegitimate."

**{37}**      In New Mexico, persons who choose to serve on school boards assume public roles with the understanding that citizens have a state constitutional right to petition the government to recall them from office. N.M. Const. art. XII, § 14. The facts alleged in Cordova's complaint regarding the recall activities undertaken in this case demonstrate the lawful exercise of this right and reveal, at most, a difference in opinion as to how the Taos school district should be managed. The conclusory allegations in Cordova's complaint are based on Petitioners' disagreement with his conduct and actions as a school board member.

**{38}**      From the face of Cordova's complaint, we cannot decipher precisely how Petitioners' motivations, even if political, make them improper. Nor can we identify an illegitimate motive on the part of Petitioners. In reviewing a dismissal for failure to state a claim, dismissal is appropriate only if the nonmoving parties are "not entitled to recover under any theory of the facts alleged in their complaint." *Delfino*, 2011-NMSC-015, ¶ 12 (internal quotation marks and citation omitted); *see also Las Luminarias of the N.M. Council of the Blind v. Isengard*, 1978-NMCA-117, ¶ 4, 92 N.M. 297, 587 P.2d 444 (stating that generally, "New Mexico adheres to the broad purposes of Rules of Civil Procedure and construes the rules liberally, particularly as they apply to pleading"). However, given the strictures of the First Amendment as well as the heightened pleading standard we hereby adopt, the complaint "must include allegations of the specific activities" which demonstrate that the petitioning activity falls within the sham exception. *Oregon Nat. Res. Council*, 944 F.2d at 533 (internal quotation marks and citation omitted).

---

[3]We recognize that some of the averments may have concerned relevant events which occurred before the filing of the recall petition, but invalidity of the affidavits does not permit the district court to consider such information.

**{39}** In this case, Cordova's complaint lacks the factual specificity necessary to establish an improper subjective motivation. By its nature, the subjective motivation of the recall process may indeed be political, but that does not render it improper. Without more, the complaint lacks the necessary specificity to show that Petitioners' subjective motivation was improper and therefore a sham. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (holding that "[a] sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means" (internal quotation marks and citations omitted)).

**{40}** By requiring an improper motive, this two-step sham exception encompasses a "breathing space" that "overprotects baseless petitioners" which is necessary for the effective exercise of First Amendment rights. *Sosa*, 437 F.3d at 932-34; *see also Tichinin*, 99 Cal. Rptr. 3d at 675. Thus, just as the malice requirement in a defamation claim against a public official "protects some false statements to ensure that the right of free speech remains robust and unfettered, so too the improper-motive requirement of the sham exception protects some baseless petitions . . . to ensure that citizens may enjoy the right to petition the government through access to the courts without fear of . . . liability." *Tichinin*, 99 Cal. Rptr. 3d at 675.

**{41}** We conclude that the allegations in the complaint are not sufficient to establish an improper motive but rather are differences of opinion and political views. As such, the petitioning activities undertaken by Petitioners against Cordova are an act in furtherance of their right to petition the government under the First Amendment. Under the heightened pleading standard attributed to claims made against such conduct, the complaint fails to meet that heightened threshold to qualify Petitioners' actions as a sham and thereby pierce the protection under the *Noerr-Pennington* doctrine. Accordingly, we affirm the district court's decision to dismiss the complaint. Because we affirm the district court's dismissal of Cordova's complaint under the *Noerr-Pennington* doctrine, we need not address the legal sufficiency of Cordova's malicious abuse of process claim.

## IV.    CONCLUSION

**{42}** We reverse the Court of Appeals holdings that the Anti-SLAPP statute and the *Noerr-Pennington* doctrine do not apply. As a result, we uphold the district court order dismissing Cordova's claims against Petitioners. We remand to the district court to determine the remedies available under the Anti-SLAPP statute.

**{43}    IT IS SO ORDERED.**

 

 

 

 

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**